and up. Mr. Lawrence for the imbalance, Mr. Meisner for the government at the lease, Mr. Zorn for the incursion, and for the defendant at the lease. Good morning, Mr. Hearst. Good morning, Your Honor. Good morning, Your Honors, and may it please the Court. Richard Lawrence Hearst on behalf of the Plaintiffs' Appellants, I'd like to reserve four minutes for rebuttal. In March of 2019, the United Exum impermissibly approved a nearly $5 billion loan to subsidize a foreign company's liquefied natural gas project in a conflict zone in Mozambique. It did so without considering the environmental and economic harms in the United States or any complaints about the harms to local people, including from an ongoing insurgency and the fact that the guards that were conducting this project were implicated in a massacre. But NEPA doesn't require an environmental impact statement in every situation, is that correct? The NEPA problem at the outset is simply that they did not explain at all the basis for their decision, and so there's nothing to review. The district court said, well, I'm giving deference to the district court's, to NEPA's decision, but we don't know what NEPA's decision was. It's entirely unexplained. The district court found that plaintiffs made a strong showing that the refusal to grant the preliminary injunction would result in irreparable harm. But it resolved this case mostly on the fact that it made errors of law as to both standing and the merits. And so I'll start with standing and then move to the merits. The district court correctly found that plaintiffs had informational standing for their NEPA and economic provisions arguments. So I'll talk about the other theories. In making those standing decisions, did the district court consider the PETA decision and the alliance decision? Yes. So what the district court did was it said that we satisfied the PETA, but that essentially that PETA has been overruled by alliance, and that's not... Has it been overruled? No, Your Honor, it has not. Okay. Do they work in congestion with each other? Yeah, so let me turn to that. So PETA is a form of haven standing. Alliance explicitly recognized haven standing. Havens held that where the defendant impedes a core organizational activity, the organization has standing to challenge the impediment. Alliance agreed with that. PETA applied that principle. That's all it did, and it held that when an agency excludes an organization from a means of redress that's a core organizational activity, it has standing to challenge the impediment, the exclusion. And putting the word organizational activity here, because it sounds like you're suggesting objectionable conduct by the government and that you having to exert more resources, essentially. Well, there's two sorts of buckets. On the PETA argument, the organizational activity is the ability to go to Ex-Im and seek redress for the harms that the loan would cause. And the social standards require that the bank protects local people's rights and to ensure that Ex-Im meets its own standards, that its loans comply with its own standards. Ex-Im can either impose conditions on the loan or it can say, we're just not going to fund this loan because this loan cannot meet our standards. Section 10A of the Bank Act, the Notice and Comment Provision, and Ex-Im's due diligence procedures are the means by which people can come to Ex-Im and say, look, this project is not going to comply with your standards, and it's going to hurt, you know, us and the people we work with, and so you need to apply your own standards. That is a means of redress. When do you participate in the process? I'm sorry? At what point does your client participate in the process? At Ex-Im? At that point, they would have gone to Ex-Im and raised all these issues of environment, security, all the ways that this is going to harm local communities. You're calling that an informational injury? No, no, that is an exclusion from a means of redress. Okay. That is the means of redress. You get to go to Ex-Im and say, this project will hurt us in all the following ways that are not consistent with your standards, and you should either impose conditions or not make the loan. That's a means of redress. And the district court agreed with us on that. That's why it said that PETA applies. But they then went on to say that Alliance had overturned PETA, and that's... I guess I'm trying to understand this lack of redress argument, which is they didn't do notice and comment. Well, they didn't do the notice and comment in the 10A, and they didn't do a due diligence provision process, which also would have allowed the plaintiffs to come and say, like, look, these are the harms that this project is going to cause. If I were... I have a couple of questions, to be clear to everybody, to be fair. But if I were really sympathetic to the work Friends of the Earth or Justicia Ambiento, I'm not going to say that.  Sorry, with a nice accent. Really sympathetic to the important work they do, caring for dispossessed individuals, people facing real hardship. And so I was donating money to both organizations regularly. And I wanted to participate in notice and comment, if it were allowed to explain probably similar views to yours. And I wanted to participate in a due diligence opportunity for input to say, you shouldn't do this, you shouldn't do this, you shouldn't do this. Would I also have a standing? Probably not. Why? Because... I've been... It's an opportunity for redress for me for issues I care deeply about and that I have put money behind. Why wouldn't I? Because DITA has embedded in it a number of, I would say, probably requirements. So the organization... First of all, the process has to be a means of redress. The district court found that here. The specific harm has to be within... That's true in my case. Notice and comment is still a means of redress.  So we're even...  Let's check that box. Okay. The next box is that the specific harm has to be within the organization's mission. Accessing... So do organizations have different Article III standing than individuals? No. It's not representation, but yes. So if this were an... It's an injury to the organization or organization, right? That's what you're serving. It is an organizational injury, yes. Just as in PETA, there was an organization... This is also an injury to me, and I can't do notice and comment. So maybe I'm not... Maybe the hypothetical that you're affording to that person isn't as broad as I expected. But if I could lay out what I think all the requirements are, and then I can see if it meets your... Which ones I don't meet. Okay. So the one that you might not meet is that you are... An organization. Right. Okay. Well, yeah, if your hypothetical is if you were a person doing the exact same thing the organization does, then yes. I'm supporting and caring deeply about... I mean, I'm helping you do it by giving you money. Right. But for there to be an organizational injury, it has to be a core activity of something that... Actually engaging in the means of redress has to be a core activity, something that you do to promote your own mission. So it has to be both within your mission, and it has to be something that you do to promote your mission. And if this person who just gives money isn't actually also doing the work of going to redress mechanisms, then it is not a core activity of theirs. So I think that's the distinction. But the point is that there are a number of... I do think comment is for the public. Congress sends requirements for the public to participate in. And if I'm taking money, I don't have much. I work for the government, and I'm taking what I have and giving as much as I can and doing everything I can to support this work. Yeah, I can't be there on the ground, but I'm part of your team. I'm part of your... People who donate to you are really part of your team and your mission. They're helping you do the work. You couldn't do it without funds. So they would absolutely have a right to participate in notice and comment. The question is... It wouldn't be an article-free injury. It might not be. I don't think the court has to decide that. What I'm trying to suggest is that... I think we kind of do, because if we're deciding that the inability for some members of the public to participate in notice and comment is an article-free injury, we would have to say then it is for everybody, or we'd have to have a reason why it's not. Well, I think the reason that it might not be, and I don't think you have to rule on the hypothetical, but the reason that it might not be is that the way PETA frames this is it's an injury to a core activity. And so you have to be... The harms that you're trying to prevent have to be within your mission, and you have to be engaging in that core activity. And PETA says... Part of my mission to support this... Again, this is all hypothetical. I don't actually donate. It is part of my mission. I'm not sure what it means to be a core activity. It's one of the biggest donations I make. Do we have to figure out what core activity means, or... Well, I don't think you have to figure that out, because I think PETA already answers that question. PETA says that if you engage in using this redress mechanism as part of your work to serve your mission... In other words, it's core to what you do, but it's an activity that's core to what you do, and the government just says, you can't do that. That's an injury to your work. I mean, maybe notice and comment is one of the core things you do. I had thought the core thing you do are services on the ground to environment or individuals. I would have thought that would be your core activity, not participating in notice and comment. Notice and comment would be a tool you use to advance that core activity. Is that right? No. No, you're right. That's not correct. They do both. So they absolutely do direct services. And core activity. Yeah. I'm not sure that PETA and Havens actually give a deposition... They do, but if we're... I mean, again, it's a really consequential decision for us to decide that notice and comment... An inability to participate in notice and comment rulemaking because it wasn't offered as an Article III injury when notice and comment rulemaking across the government is something that's any interest... The test is whether you're an interested member of the public and want to participate. If I can interrupt, this is Judge Randolph. It's not only a difficult position for you, counsel, but it seems to me it's inconsistent with the Supreme Court case, the United States v. Richardson, where the injury is common to all. The lack of information generated by notice and comment is common to everybody. And that's true under NEPA, and it's true under your argument here, I think. I don't know how you square that with United States v. Richardson. Well, just to start with your question, Judge Randolph, this particular argument is not about information. It's about the ability to participate. It's about the ability to participate. Yeah, but... Okay, so there's a loan that's authorized at the beginning. Where were you all? Were you at the table then on notice and comment? We participated in the due diligence process in 2019.  So there was two processes. We participated in the due diligence process. But you're challenging now the inability to participate a second time. Yes, because everything has changed. There's been a war since then. Well, counsel, can I ask you, I mean, the question of standing is not frozen in time. And you talk about things have changed. But things have changed as of today. The project is going forward. It restarted. And there's a new organization, the Mozambique LNG, that is helping 8,000 of these people in one of the poorest countries in the world. And it's generating 7,000 jobs. And so many of the arguments that you make were speculation. And it turns out that speculation is not accurate. So, yes, things are not the same. But they're not the same today as they were when the extension was granted. The only argument we're trying to make for this PETA claim is that we were entitled to raise these concerns. And we were shut out of that process. And just to return to a question you asked me, Judge Millett, this is not notice and comment rulemaking. There's no rule being... I guess I'm just... Notice and comment happens across government in different forms. Sometimes it's rulemaking. Sometimes they have to respond. Sometimes they don't have to respond. But notice and comment is always, as far as I'm aware of, always opened up for any interested member of the public to weigh in. I think that's fair. But I think the central point that I want to make about that is that if you're trying to determine whether this is a means of redress, as opposed to something else, like more generally like notice and comment rulemaking, you have to look at what they're actually doing through the process. I think we've also held, and I believe the Supreme Court, too, but certainly we've held that advocacy injuries. So don't count. The fact that you have to engage in additional advocacy doesn't create an injury. The fact that you want to engage in advocacy is not an injury under Article III. Why is not... Why would... Is it the commenting you wish to do for this notice and comment process? Isn't it just a form of advocacy? You want to advocate for the people you serve consistent with the interests you advance? So I think PETA answers that question, too. PETA explicitly distinguished between denying access to an agency's means of redress and cases, on the other hand, that involve, quote, pure issue advocacy or a mere interest in a problem. And I think the Court's bound by that holding. But explain to me why this isn't... Why what you would do in a notice and comment process, the input you would provide, wouldn't be issue advocacy. Well, PETA specifically says in footnote four that, sure, you can comment. You can characterize all sorts of stuff as... Just tell me why what you wanted to do here wasn't going to be issue advocacy. Because what PETA says is when you are trying to participate in a means of redress, that is not issue advocacy. And you are excluded from... I'm sorry. I'm sorry. So you're here before this Court seeking redress for your client. You are participating in a means of redress. And if this Court said I can't... And it sure also looks like advocacy to me.  So I'm trying... And people participate in notice and comment proceedings all the time. And they advocate for what they wish the agency to do. And so I'm trying to understand. So I don't think the answer is going to be in PETA for you. I mean, if you think it is, please refer me to it. But I'm trying to get a practical answer from you for how the comments you wanted to provide to EXIM. That's usually what happens in this process. I assume just comments you wanted to provide would not be you engaged in advocacy. It could be very good advocacy. That's not the issue. But it would be advocacy. I feel like that's what the notice and comment process is. Well, so the holding of... I'll start with PETA and then I'll go to what we wanted to do. The holding of PETA is that when you are seeking a means of redress, that is not the sort of through an agency process. And you are excluded from that. You have lost a concrete... You have suffered a concrete harm in a way that's different from just trying to generally promote broad policy. Does it matter where we are in the process? So there's the initial loan, giving of the loan, and you mentioned that you all were there for that in 2019. But then we're talking about an extension time period now. So does that matter about whether the loan was given at all versus just an extension in terms of your arguments? Well, I think it matters on the merits. I don't think it... I mean, that's sort of the fight on the merits. I don't think it matters for standing because you have to take our view of the law, of the statute, for standing purposes. And we believe, I think the statute says that we were improperly excluded. There's an extensive notice and comment process at the beginning. There's all this ability of the public, anybody else who wants to chime in, to deal with that. But then we're just talking about an extension here. And so why is there some real need to be there when the material terms of the loan, the project aren't different, the extenuating circumstances around everything potentially different, but the loan had been given? Well, this is a merits argument, but let me just make it because I think it's how it answers your question. What the statute says is that there has to be notice and comment before any meeting of the board for final consideration of a long-term transaction. This went to the board for final consideration of a long-term transaction. That means there has to be notice and comment. So the statute, on its face, by its clear terms, allows us, required Exum to have a notice and comment procedure. Our position on standing is that we have standing to raise that. You said you already provided comments, at least on the due diligence process, in 2019. You chose not to do notice and comment then. There was a change in ownership in 2020 and didn't participate on either grounds. You didn't argue for it there. Where in the record have you shown what you would have said for notice? Had you been allowed to do notice here that you have not already conveyed to Exum? Well, it's in the two job declarations and the FOA declaration. To summarize it briefly, one of the many things, the most obvious thing that we would have commented on is the fact that a war broke out. I believe everyone was aware of that. That's why Exum was aware of that. In both force majeure, again, I don't have a good French accent, but they invoked that. They didn't stop. That's the whole reason they have the extension. Exum was fully aware that there were violent guerrilla activity in the area. Sure, but they weren't on the ground because they couldn't go there. All their information came, as far as we know, from Total. This insurgency had already broken out by 2019. Did you include information about it in your due diligence in 2019? I'm not sure what we said about it in 2019, but the insurgency exploded in 2020. That's when they declared force majeure. I'm sorry, 2021. The massacre at the Project Gates by Project Security was in 2021. Those are the sorts of things that we would have raised. They weren't getting that information from Total. The only way they were going to get information about that, about seeking a means of redress, how to prevent these harms, was from us. Just to give an example of this, Exum's staff said it considered the security situation in 2025. We know for a fact that that security plan that was existing in 2025 was inadequate. The reason we know that is because two months later or three months later, Total scrapped it. They said this security plan isn't going to work. The security plan that they adopted was one where they were going to make a perimeter, or they are going to make a perimeter, that protects the project but leaves local people outside the fence. Everybody, all of the evidence in this record is that by restarting this project, you're making not just the project but also neighboring communities an Al-Shabaab target. Total's security plan is to throw their neighbors to the wolves. We would have commented about that sort of thing. They're not going to hear that from Total. Okay. If there's no further questions from Judge Randolph, then I will give you some time to go. Thank you. Thank you, Congress. One second. May it please the Court, McKay Newmeister on behalf of the government. Plaintiffs here have not established a substantial likelihood of standing to enjoin the disbursement of loan funds during the pendency of this litigation for three reasons. First, their allegations about the denial of an opportunity to submit comments in 2025 is a procedural injury in vacuo and pure issue advocacy that is not sufficient to support standing. They rely on the PETA case. That case is distinguishable on its own merits, and it's also the theory of organizational standing underlying that case was eviscerated by the Supreme Court's decision in Alliance. I mean, we have a pretty strict evisceration standard. They are irreconcilable. They can't be in an alliance, you know, on a similar theme. But it was much narrower than PETA. It didn't involve the same situation of where the USDA just was not engaging in the statutory required activity at all. And so it was like a wall that the plaintiffs there couldn't get through to get them to do activities that would generate reports, get information injury. And so it's very different than what was going on in Alliance for Hypocratic Medicine. So I think the facts are different, Your Honor, but if you look at the organizational standing test that was applied in PETA, that was this circuit's test, and the test that the Supreme Court set forth in Alliance, those are fundamentally inconsistent. In Alliance, the Supreme Court said that it's not enough to divert resources in order to oppose government action consistent with an organization's mission. You actually have to show that there is a direct interference with core business activities. And the court made clear that there are two examples of what that looks like. One was how the court explained what happened in Havens. You have an organization that provides direct services. It is directly being given false information that is impairing its ability to provide those services. Those services are core business activities, that that is the kind of causal nexus and injury that's sufficient for organizational standing. The court also offered a second example in discussing this, and it says that if there's a manufacturer that is selling defective goods to a retailer, that that's the kind of direct impairment of the retailer's business that can give rise to organizational standing. We have nothing like that in this case. So imagine, this is clearly hypothetical, but imagine that as part of setting up this pipeline, that in order to protect themselves against al-Shabaab, the company proposed to put landmines anywhere within a mile of the plant. That will keep people away. And these organizations here are trying to take care of people suffering a lot within a mile of the plant. And now they're at risk of blowing up. Would that count? That sounds like a pretty concrete interference, but they're on-the-ground activities. I think that that is a very strong argument and a very— Strong? I have no reason to think, putting aside causation, I have no reason to think that that's not the kind of injury that would be a direct impairment of the ability to provide services because they're independently engaging in these services. It's an independent core business activity that they're doing on their own apart from opposing government action. And then if there's something that comes in and then prevents them from doing that, that is the kind of direct injury that is what the Supreme Court is talking about. They say here that—just to follow up, sorry— that what is coming in with this pipeline is an operation that is literally drawing targets on them and their clients' backs. And this is not fanciful hypothetical. This is not speculative. People are already dying. Roads are already unusable, right? The hotel has to fly its people in. They have drawn targets on their back. I'm sure—not deliberately, but that's not really battering for standing. And again, there's obviously disagreement on the merits on these things. But just for the purposes of standing, if we assume they're right, the approval of this pipeline has targets on its clients' back and anyone who's working in the area of this plant, why isn't that sufficient direct interference with their on-the-ground operations for standing? So that does sound like it could be interference if they cannot— if their ability to provide these services is interfered with. But it is not direct in the way that the Supreme Court discussed in Alliance. There, in discussing Havens, you had an organization that was directly giving false information to the plaintiffs and they could not use to conduct their services because it was false and their services were then meaningless. When you have a manufacturer directly selling to a retailer, that's direct interference. What we're talking about with this insurgency theory of causation, it is an attenuated chain— I don't know that it's that attenuated. I get your point. I mean, that certainly was going on in the Alliance for Hippocratic Medicine case, very attenuated. But here, the company itself recognizes the extraordinary risk occasioned by its very presence. That's why there's this fence going up. This is going to be an attractive target. And so we are putting up this fence. We're helicoptering our people in. So they're not intentionally drawing targets on anyone's back, but they are acutely aware of what their operations are doing. And I'm just asking for purposes of standing why that's not a substantial risk occasioned by this activity. So, yes, Your Honor, if you look at the court's decision in the Alliance, they sort of separate out two things. There can be a causal chain where there are multiple links that are too speculative. Your Honor's hypothetical posits that they're not actually speculative. But there's a difference between something being too speculative and too attenuated. Here, to be too attenuated means that you're actually, even if we think these links are likely to happen, you're so far down the road from the challenged government action that you can't say that that action is what is actually causing these results. And here we have allegations that EXIM approves the amendment. Because of that, the project can go forward. Because the project goes forward, it's going to create a target for this terrorist insurgency. Beyond the insurgency that's already operating in the region, it's going to increase those risks. And then as a result of that, you're going to have response from security forces. But we're assuming those forces are not going to be able to sufficiently respond to these risks. And at the end of the chain, because of all of that, it's going to be harder for these organizations to provide services on the ground, harder than it already is because of the terrorist insurgency in the region. I mean, I understand your point about attenuation, but really it's sort of a but-for cause here. But-for this fund, and maybe I'm wrong, but my understanding is but-for these funds, no plant operating. And I think but-for causation is different than what the Supreme Court in alliance with. But-for causation is pretty direct. The direct relationship that the court was discussing in that case was there is a direct relationship between these two parties. The kind of relationship that gives rise to standing in private parties out in the world, not just challenges to government action. You have a retailer and a manufacturer, a direct interference with their business. You have an organization that uses this information being given the information. If you give this person this money, I will be shot. You don't give this person money, there's less risk. I should say substantial risk, I'll be shot. You don't give this money, that substantial risk reduces materially. Is that a direct cause? So it's not because-it's not direct in the sense that we know that there are multiple independent actors in that causal chain that independently are- You have someone who is essentially lights the fuse. If you light the fuse, knowing where that fuse is going, first it's going to blow up this area. And then it's going to next blow up where these people are working. Is that not direct? I don't think it is, Your Honor. And I think another way to think about what the problems are here is the causal link at the very end of this chain that the organizations are saying that they need to be in the region providing these services and that they are basically being prevented from doing that. But the reason that they're doing that, they say, is because they tried to advocate against the project. They wanted to be able to advocate against the amendment and shut it down entirely. They couldn't do that. So as a result, they have to shift their resources to the region and then provide these services on the ground. They're saying they're forced to do that. They're only forced to do that because it's their mission to oppose this action. It's a voluntary choice that they're making to expend these resources to oppose government action. And they're saying that that is, you know, that's being harmed, their ability to carry out their mission is being harmed in this way. And that's simply not the kind of organizational standing that the Supreme Court recognized in alliance when it clarified this doctrine and the issues that had arisen in the doctrine in this space. And what do you understand to be Friends of Earth's participation in 2019 in terms of the notice and comment period when the loan was actually extended initially? So I know they didn't file comments in response to the actual notice and comment process under C-10. They explained that they participated in the due diligence process. I think that's reflected in their brief that they submitted comments. I think the brief says that they were submitted in 2016. I'm not specifically aware of what other participation happened after that point. I also know that they have been in touch with EXIM sort of after the loan was approved in 2019 to express their concerns. The briefs reflect that there were various meetings, letters of grievance filed, and they sort of have been participating, voicing their issues that they're trying to figure out. Who else made the decision to not have a notice and comment period at the point of the extension? Why was that? So no notice and comment was held at the extension in 2025 because it's not required under the statute. When Congress set up— And you're saying that because your final approval of the agreement was back earlier. Correct, Your Honor. You're considering the extension not a final agreement and not required then. Yes. So C-10 sets up a narrow notice and comment process that only applies when there is a high-value transaction over $100 million that has to be decided by the board, and the board is going to act on the application for a final commitment, which is referring to the request for the transaction comes in in the first instance, and they decide are we going to approve the transaction or not. But I think it's helpful to look at the actual process that takes place before EXIM. So there's that determination. Are you going to approve an application? Sort of the overarching question. After that happens, then it goes down to the staff at EXIM, and they have to put together the relevant financial documents and ultimately execute an agreement with the borrower. So now there's a loan contract in effect. That contract was executed, was operative and in effect, and was still in effect as of March 2025 when the amendment was approved by the board. So there was no new application. There wasn't a new loan. There was an existing contract between the parties that the parties needed to be adjusted, and then the board had to vote on that to approve it because of the nature of its delegated authority. That did not make it the kind of new application that the process is contemplated for in C-10. And it's important to recognize that these activities are expressly exempt from notice and comment rulemaking under the APA, and Congress decided not until 2012 to impose a narrow notice and comment requirement just for these high-value long-term loans. Is that really your better defense as opposed to kind of jumping into standings, whether it's attenuated, if there's a causal link and what the intervening activities and everything are that you just didn't have to provide notice and comment? So we think we run on both, Your Honor. Standing is, you know, obviously jurisdictional, and so, you know, there's a reason that we discussed it first. We think that the district court was correct, that plaintiffs simply don't have standing here on a majority of their series. But if the court disagrees, then on the merits, we think that it's clear that there are narrow procedures that Congress wanted to impose, so that EXIM could function like a bank and have the flexibility that it needed to engage in banking activities and to amend financial transactions that an ordinary financial institution would also feel the need to amend in the course of its business. Congress wanted a narrow notice and comment only to serve the objectives of the Bank Act. Once that was satisfied in 2019, there was no obligation to engage in additional procedures for this kind of amendment. The amendment was only a four-year change. If it had been two years, it could have been handled by staff without involving the board at all. It was four years because of this four-figure situation. Good question about that. So what was happening was you have a brand-new foreign company, not the original U.S., offering a brand-new security plan for a new, materially new, threat that had gotten so dangerous they declared force majeure. Why isn't that the type of material change that still requires the notice and comment under, I'm not going to get all the numbers right, 635A? Yes. So the material change provision in the statute only applies where there is an application that has been submitted under consideration. The notice has already been published in the Federal Register. And then that application that hasn't been acted on yet has changed. And so at that point in time, if the change is— This is definitely an application. It's an application to let's—by moving the dates, I mean, you can call it just moving the dates. But, in fact, what it is is saying we're moving—shifting this whole contract forward into a totally new environment with a totally new company. That's hilarious. That's unfair. A new and newly more dangerous environment with a new company that we presumably have not yet ever seen this type of security plan from. And you have a definition. I think it's maybe GA4—it might be the Administrative Record 410, but a definition of material change. So the material— That seems to definitely include, right, I guess the board resolution, the definition of material change. Lots of impacts there, Your Honor. And I want to try to answer as much as is helpful to you. The definition of material change that's in the board resolution is not key to the meaning in the statute. What that means is that the board has the authority to do all of this business. It delegates that authority to staff for certain things. No, it gives us—staff can't do it. It means the staff can't do it. But it's material—there's a difference between what's material for the board to want to know about for an amendment to go forward and what Congress thought was material for notice and comment purposes. I understand. So I understand, right, this was not defined in a statutory term. But, you know, material change only has so many meanings. And the factors they have here seem to be exactly the types of risks to the government's investment of taxpayer money that Congress would have wanted to call material so that these new conditions could be expected to substantially and adversely affect the ability of the borrower to pay their obligations. That's—I don't know why that wouldn't be material under the statute. It would affect whether they can even get an insurance policy. That seems pretty—if I'm a bank, that's pretty important. Security interests. I mean, it feels to me—I understand the procedural role of this resolution. It's not really manual. But how is—if this is going to substantially and adversely affect just one of these, the ability of this company to be able to pay back its loan, would that not also be material for purposes of the notice provision? So statute— No, because the notice and comment provision in the statute only applies under limited circumstances. All of the parties are in agreement that this material change provision in the statute only applies if there is a pending application that has been published but has not yet been finally decided upon. So the question is, is what we have here an application under the entire meaning of C-10? And the answer is no because of how this provision lays out what kind of application is subject to this notice and comment process. So specifically, if you look at the language of the statute, and it's in—second, Your Honor. It's in C-10C, Romanet 1, Big I. The bank shall publish in the Federal Register a notice of the application proposing the transaction. I think I might have lost that. Sorry, sorry. I might have put the wrong Romanet here. It's under C, right? Specific requirements under C. Oh, yeah, under C. In general, the bank shall, one, publish in the Federal Register a notice of the application proposing the transaction. So that is the application that is driving this process. Is there an application proposing the transaction? That was the application that was filed back in 2015 seeking financing in the first place for this process. It was filed by a different company at a different time when there wasn't this insurgency or terrorist threat. I mean, now you've got a totally different company. It's not even an American company. I think it was a French company. I don't want to disagree if I'm misunderstanding, Your Honor. But I think the change in operator actually happened back in 2020 before this amendment. I'm sorry. I didn't put all my factors together. So, again, they didn't—they're challenging that. I mean, I would have thought maybe that would be a pretty material change too. Yes, they didn't challenge anything. But you have a new foreign company coming up with a security plan that didn't have to be formulated before. And so it seems to me that, again, just the company switch itself is not an issue in this case, but putting that together with an entirely new security risk. And it really is just sort of saying—moving the dates is saying we're going to go forward with this loan and contractual arrangement, this new company, in an entirely different physical environment. So in order to— I think anywhere wouldn't say that's a material change in circumstances. So there's a difference between saying that it's—that the change is something that the board would want to have the opportunity to consider, which is what the board did in 2015, is different from the question of whether Congress imposed mandatory notice and comment requirements in—for this kind of transaction. Sorry, not transaction, for this kind of amendment. And Congress simply didn't. Nothing in C-10 applies to amendments to transactions that have already been approved, whether it's an application and the final—the decision to issue a final commitment in response to that application, there is a transaction. So a loan was already given, but you're challenging whether or not one's already given, and regardless of what other circumstances happen, you're just still relying on that initial application that was granted and that you're just moving the date on the extension. And you would say, regardless of these material significant changes, that doesn't matter because the loan was granted? It doesn't because this notice and comment process only applies at the front when the board is making the decision, are we going to approve the application, are we going to authorize this loan or not? Once the loan is in effect and there's an executed contract between the parties, that is operative. The parties were operating pursuant to that contract, there were obligations that were being met, and the credit commitment of $4.7 billion was committed. It was there, it was available, it was waiting for the circumstances to be satisfied for that to be drawn down, and it's still there waiting for the circumstances to be proper to be drawn down. And you don't have to rely on the initial application grant process, that there's nothing that could ever change that based on extension? There's not-there's not nothing. An extension of date is-does not create a new transaction. There are-there are... I might be able to agree with you on that, but I'm asking also about a difference in circumstances, as Judge Melendez is indicating too, whether it's the climate of-in which the extension is being granted, the reason that you had the force majeure in the first place, not just the movement of dates, because that does sound very ministerial. Yes, it's the kind of amendment that's routine for a loan that the parties can mutually agree to engage in, and the thing-turning out of the activity, it's a very standard kind of amendment. Yes, extension of date is more ministerial. So only- But it's a matter of circumstances. Yes, sure. Does that ever open up your comment period again? That's what we're getting at. Only if an amendment is requested that EXIM looks at and says, this is not an amendment to the application that we've already approved. This is not the same project that you're asking for funding for. This is something different. This needs to come in as a new application. So, for instance, if, you know, this is a project for liquefied natural gas in Mozambique, if they submitted an amendment and said, actually, we want, you know, a project for a coal extraction project in Tanzania or something. If there's a different country, if there's a different product at issue, then that's the kind of thing that's not an amendment to an existing loan within the scope- Or an extension of a project that was already existing for which you granted the loan application. So if there's an expansion within the scope of sort of what was originally contemplated, then that's the kind of thing that a loan could be amended for, because the project itself hasn't changed. They've gotten approval for this transaction. For the project that was within the application, if that's just within the scope of what the board already understood it to be approving, that's not a different application. It doesn't have to come in separately. Also just note that if the board were to approve something without notice and comment for $75 million, for instance, and then there was an amendment request that came in and said, actually, we want to up the credit that we're asking for. We want our credit commitment to now be $101 million. If it comes from underneath the notice and comment limit to above it, someone would look at that and say, okay, now you're actually asking for something that falls within C-10. We can't just authorize that amendment. We need this to come in to go through this whole process. But apart from circumstances like that where it isn't actually a true amendment to an already approved application, this requirement doesn't apply. And that's because Congress wanted these narrow notice and comment requirements to ensure that it did not interfere with the bank's banking business. I just have a fact question. Was the company given sort of a first disbursement of funds before it declared force majeure? No, it wasn't. Those funds were disbursed. They weren't. So in 2021, it was before force majeure was declared. It was determined that all of the sort of prior conditions that had to be satisfied in order to make the credit available to allow disbursement to start, that had all been satisfied. It was before the force majeure. Yes, Your Honor. That's why I'm asking because part of this is trying to figure out whether this is the final consideration. And if the money had not yet started running and then you have this, I will use as a generic term, pretty material change in the environment and obviously the risks to this project for the money that starts to run. How do we, I guess this isn't their first application, but given some of the things you've said, you know, well, if it's a different location, excuse me, Tanzania is a different country or something, but if it was, if they had said, we, you know, here's a place we plan to do it. And then in the intervening four years, that place floods. You know, climate change and stuff, but it's now flooding three times a year, serious flooding three times a year. But they still, and they never got any money, but now they want to, they've come up with a plan to deal with this serious flooding. That wouldn't count, that wouldn't trigger a new application? It wouldn't, Your Honor. So once the agreement has sort of been put into effect. This is a wild bank here. I mean, how is this designed? You're dealing with tickets. It is. And there's a difference between something that the board wants to know about before approving an amendment. And, you know, we have in the record that staff put together information that address these various considerations that plaintiffs are raising to present to the boards that they're aware of these things before it approves the amendment. So the difference between that and the narrow circumstances that Congress thought the public needed the opportunity to comment. And if you look at, in 2012, this is when this went into effect. And there is some legislative history in the record discussing why Congress wanted to impose this public notice requirement. And they explain that it's to ensure that the board has the information that it needs to make sure it's approving a transaction that's not going to hurt domestic industry. And there were concerns. Speaking of that, when was it peaceful? Like, when did this conflict begin? Before the initial approval in 2019. So there were some circumstances of which you were aware that you were entering into the project. Yes. And in the record, the memo is reflected. This is something that Ex-Im was aware of before it entered into the loan in the first place. And before it got approved. Yes. And so Congress wanted to make sure that the board had the benefit of comments so that it could decide whether this was not going to harm domestic industry. And in doing that, in the legislative history... Does it also have an obligation, though, to ensure wise use of the taxpayers' money? It's going to advance the interests of the people of the United States. Is that not also one of their requirements to consider? In general, they're in the various objectives. I'm talking just specifically about the piece of legislative history about why they wanted wise use of taxpayer money. And they're now putting this money in a place that's going to flood three times a year and be inoperable. And that's something that if it's an amendment that has to go to the board, that the board, you know, is taking in a lot of information, is considering a lot of things about whether, you know, there is a basis for continuing it or not. They're all getting information from the applicant. So, as a formal matter... Yeah, tell me. Yeah. So, as a formal matter, they get a request for an amendment, and then the staff sort of does a bunch of, you know, work to put together and analyze various considerations. But there are processes for other individuals to submit letters, to have meetings. Also, it's not a formal process, but plaintiffs in this case had meetings with EXIM, submitted letters, filed a grievance.  Not in 2025, but it was between 2019 and when the, I believe, when the request for an amendment came in. So, they're not... Was it post-force measure? Yes, it was post-force measure that there were communications. So, it's not the case that EXIM is unaware of these considerations. That's actually helpful to know, but how are people supposed to know when they had reason to know because they were on the down, you know, their clients were getting killed? But how is the public supposed to know? So, Congress knows how to draft a statute that requires, that imposes additional requirements on amendments after an agency initially enters into this kind of financial commitment. Maybe a more elementary question. Yes. When they file this application, is that a matter of public record? Do you go to the EXIM website and see those things? I believe you can track it on the website. In the record specifically with this application, it was filed in 2015, and then EXIM posted it online, I believe, in 2016, which is when they had the statement that they made the determination that it's not a major federal action for NEPA purposes, but they posted it online to make clear that they were considering this project and also linked to a social and environmental assessment with respect to the project. So, it is public knowledge. I'm talking about the application to move the dates. So, what is the issue here? I'm not aware if that is something that is specifically public as a matter of it being published by EXIM. I want people to know that they can send in letters to staff. I mean, this is important to staff to hear what's actually going on on the ground. So, I don't think there is a specific process for that, but Congress didn't impose one. And part of the reason is that it wants EXIM to be able to operate competitively as an expert credit agency. And in the legislative history I was discussing earlier, I said that notice and comment is important so they have information about domestic industry. There were concerns raised about this actually delaying transactions. And the response was, you know, we don't think this is going to. This is just a short notice and comment period. And we expect that after that point, they're going to be able to sort of move forward quickly and put these transactions into effect. That concern about sort of the speed and flexibility with which the bank can act, just to be clear, there was four years of due diligence. This was a thorough process. But the ability to move forward once they know they want to approve a transaction is important. And the upshot of plaintiff's theory is essentially that every time a loan over $100 million needs to be amended in some way, that that change is now the final consideration that has to go through notice and comment all over again. And that simply fundamentally cannot be what Congress intended in putting this together. And... I'm sorry. You have a long time. I apologize. I just want to sum up in one minute here unless Judge Randolph has questions. No, I'm fine. Thank you, Your Honor. So, as a fundamental jurisdictional matter, plaintiffs have not demonstrated a substantial likelihood of standing. And regardless, the district court was correct that they did not demonstrate a likelihood of success of merit of any of their claims. And for these reasons, we ask this court to affirm. Thank you. Jigar? Thank you, Judge Millett, and may it please the court. I think I'll begin with the standing question. As I heard my friend this morning begin on that issue, it seemed to me like he was making a classic means of redress argument of the type that I think the Supreme Court pretty squarely rejected in the Alliance decision. You know, I think that quickly leads him to fall back on the PETA decision of this court. I do think that PETA, as the district court recognized, is questionable in light of the Supreme Court's decision in Alliance. I think this court and the Center for Biological Diversity has already essentially said PETA should be limited to its facts. And I think PETA is different here in meaningful respects. The claim in PETA, as I think Judge Millett, you mentioned earlier, was based, you know, squarely on the agency's decision not to regulate at all with respect to specific class of animals, birds, and the exercise authority that it allegedly had under the Animal Welfare Act. And this is not a case in which the claim is that the bank is not regulating at all. The claim here is that the bank has not engaged in, and notice the comment process, a purely informational harm, procedural harm. But what the agency's not doing isn't what decides standing. It's what the injury asserted was. And so, to the extent they're arguing that we, like PETA, as a result of this action, are not able, you know, you're not treating this action as you should treat it. It's almost like you're not regulating birds at all or protecting them at all. In approving this type of material change, I think they said this was the longest extension they'd ever done. And it was dramatically new conditions with a new company. So, just not doing any public input or notice would be well analogized to what was going on in PETA. Their injury is, we need you, we need you to be doing this regulating. This isn't just an extension action. Yeah, I mean, with respect, I would disagree. I mean, in PETA, it was the agency is not acting at all, period. It was in an action plan. In this case, the agency has been acting. It obviously had notice and comment process. I think their injury, they would have an article three injury if EXIM didn't act at all here. I think it would be closer to PETA, Your Honor, and this court would have to reconcile with its own precedent. My only point here is that the PETA case is distinguishable, and I think that, you know, this really should be guided by the heartland of the analysis and alliance. But here, their claim is not, you know, really, when you look at it, it's the failure to engage in notice and comment that they say was owed under the Bank Act. And it wasn't, and I'd like to get to that merits question, but it's not.  I would assume the answer to the notice and comment question would be the same if it was, if they hadn't acted at all. And, you know, you should have acted, like the Department of Agriculture. And had you acted, had you regulated, you would have done this notice and comment thing. I would have thought you'd still have the same issues under article three with the notice and comment. I think it's distinguishable in terms of what was going on, because here you have an agency that is regulating and has engaged in notice and process, notice and comment with respect to the long-term financial transaction that is at issue. And, in fact, it continued to receive comments and input on the transaction, even after the amendment was proposed. I mean, the bank actually engaged in a separate memorandum, and that's available at JA 719-62, in which they continue to analyze this issue with additional input. It didn't engage in the statutory notice and comment process, because it wasn't required under the statute. And just to sort of, you know, flip forward to that, my friend walked through the statutory terms, but I think they're very important. I mean, the statute requires notice and comment with respect to final consideration of a long-term transaction. That's in 635-A-C-10-A. But then it goes on to set forth the specific requirements, and that's in C-10-C. And it says, publish in the Federal Register a notice of the application proposing the transaction. The transaction is the loan that funded this project. The fact is, is that Congress didn't establish, it might have, but it didn't establish a separate notice and comment process for every amendment. The transaction itself, the loan itself, the terms of that do have, do cover amendments. But the statute, Congress didn't require the bank to engage in a separate notice and comment period for every proposed amendment or any amendment. And that makes sense because the- Material changes. With respect to the application, on material changes, Your Honor, what it says is material change as to the application for a loan or guarantee. That's in D-Romanet-2. But since the money had never actually started running to them, then how do we know that this was not-had it been running and then it had to stop, I think we definitely would have finality. But if they hadn't cut a check or whatever, transferred money to them, actually transferred money to them, how do we know it wasn't still at a point where it wasn't finalized? Usually that's how you know you're- Well, we know- You get the money, and they hadn't gotten the money yet. Right. We know that the application was for the loan, and we know that was considered and finally approved by the bank. Well, they said a month before the force majeure. We're, okay, now we're finally-okay, now we're ready. Please give us the loan, and it never happened. So I'm just wondering. It seems to me there's some complexities with, at least just on the facts of this case. I understand the point about applications, but it's-the status of this one is a little less clear if they ever-they hadn't actually completed it, which I think how you complete a loan is giving folks money, and they hadn't done that yet. I think that's not at all the way the statute is drafted. The statute is drafted in terms of the application, consideration of the application for the loan. That was considered-  Final transaction. It's a final- And this, you know, if-if-sorry, this is-I'm trying to do the math in my head here. So if in 2020 they had-and they're still going through the process of getting final approvals and everything, get themselves set up to be in a position to start receiving the monies and actually-I don't know if you have to be ready to run the project when you get it, but whatever it was that caused them to wait until March of 21 to say, okay, now we're ready. Now we'll take the loan. If it had been much earlier, would we still consider it final? I mean, how do we-how do we know when the application process has-is being finalized, has been finalized, the final action has been? It's not when the money's sent? So the question of the statute is final consideration of a long-term transaction. And we know that the agency gave final consideration to that transaction when it approved it in connection with the notice in common that it gave. And what you're-I think you're talking about is when did the loan somehow become operative. It was operative when it was approved, and there was a number of conditions. Like any complex financial instrument, there are a number of various provisions in there. And, you know, one of the triggers in terms of timing was affected by the delay, and they simply amended that loan to extend the financing period, all, by the way, during the period which was considered when the board approved the loan transaction. The conditions precedent to disbursement of funds are not precedent to final action? Not before the board. I mean, you have an application which proposes a transaction. That's considered. There's notice and comment with respect to that. The board approved that. And then there was a subsequent amendment. The amendment provision, which is in Section D, refers to material change with respect to an application for a loan or guarantee. The application had already been approved. And, again, when you think about the way banks operate and loans have to work, there are many amendments to loans. And if you had a provision. I'm talking about with these conditions. What are the conditions precedent to getting this money? I assume those are part of the proposed contract. And it was those conditions precedent were approved by the bank. I know, but they weren't met yet. Imagine they'd never met them. Your position would be they still had taken final action on this transaction. The final consideration of a long-term transaction, sure. I mean, the bank considered it and approved it. I mean, we're talking about things that happened, and this is why the terms of the loan were amended. But the application itself, which is the central document under the statutory scheme, was presented to the board, considered by the board, and finally approved. And, again, Congress could have written a statute differently. Do you equate final considerations with final approval? I think the final consideration is part of the final approval. And I think it refers to the transaction, which, as the statute makes clear when it's talking about the specific requirements, is the notice you have to publish in the Federal Register, a notice of the application proposing the transaction. Approval happens before the conditions precedent are met? The conditions precedent are in the document. I understand those are in the agreement term. I'm saying final approval happens before the conditions precedent are met? Yes, they certainly can. Because you have an instrument that's looking forward. I think that they, you know, typically you would have an instrument with various conditions precedent, and that is what the agency is considering it approves. And then you go forward as you would in any other commercial transaction. Whether there's a delay for one reason or the other, and you have to go back and look at it, you could amend it. But the statutory question is whether amendments have to be run through the notice and comment process. Here the notice and comment and the various processes that took place took years. So if you had a regime in which every amendment required this to go through the process again, nothing would ever get approved, nothing would ever get done. If I could just circle back to the standing question, though. I think they are making basically the same argument as their central argument that the Supreme Court rejected in Alliance, that because they're unable to participate in this process with the agency, that they're going to have to expend additional money in getting the information out, and that that is a harm. And I think that that does not work. And I think what — But you would just say there's informational standing under NEPA. I'm just going to state the merits of the NEPA claim. But they definitely have standing for the informational requests for NEPA. I don't think that informational requests on its own. I think they have to connect it. And I think it's back to what the Supreme Court said in Alliance. No, no, no. We don't. I mean, when you have a statutory right to information, that's like FOIA. We don't require people to show yet another injury behind that. If Congress says you have a right to information and you're not given it, that is an article of free injury. We're going to revolutionize FOIA law. Well, I think in Foundation for Economic Trends v. Ling, what the court said was it had never sustained an organization standing in a NEPA case solely on the basis of informational injury. And here, by the way, they did — They didn't reject it? I don't — I mean, I haven't gone back and looked at all cases from that perspective. I mean, I think it's — What — NEPA is government give us information. FOIA is government give us information. What injury does someone need in a FOIA case other than I asked — I had a statutory right for information, I asked for it, and I didn't get it? Do you agree that that still gives you Article III standing in a FOIA case? I don't think the informational harm alleged — Do you agree that gives you Article III standing? No, I don't. In a FOIA case? I think you'd have to show something more than just the informational harm. I mean, FOIA may be different, Your Honor, but — Wait, wait. I don't know how we draw this line. How do we know? NEPA is an informational agency. You're supposed to have this information. And FOIA is agency. You're supposed — you have it. You're supposed to give it to us. But we don't require that they have, and I need that information because it will help me write my book. We don't require that in FOIA. And so I'm trying to understand under what rationality you believe that we could require more than the informational statutory argument that I'm entitled to this information by law Congress has passed, other than I asked for it. Yeah, I mean, I think if that's the case, then it would greatly expand standing in the environmental context because anyone could come in and say, well, I want additional information. Well, it has to be NEPA that's — I mean, again, nothing to do with merits. We assume they're right on the merits that a NEPA analysis should have been done here. I'm not decided in terms of that, but we assume that for standing. And if they were right and it had to be done, they were entitled to see that information. That's all they have to do for an informational injury. A lot of people got a question, didn't touch informational injury. Right. I mean, I think that would be consistent with foundation for economic trends. I think, you know, just to leap ahead to the merits, where the courts of the informational injury under NEPA in itself wouldn't confer organizational standing, but I think just to jump ahead to the merits, there's clearly no right to information under NEPA here. There was not a major federal action here, and the agency actually found that. And you can look at JA-184. Moreover, NEPA's extraterritoriality exception would clearly apply here. We're talking about a project that's halfway around the world. And so I don't think there's any basis for them to claim a statutory right to information under NEPA. And so I think — I said we assume the merits. No, right. I was just responding to your standing argument. Right. So I think that, you know, if you disagree with me on standing, then I think on the merits, they've got no statutory right to additional information under NEPA. NEPA clearly doesn't apply. It's not a major federal action, and it's an action that's not taking place within the jurisdiction of the United States. The last thing I would just say on standing, Your Honor, is I think that they are ultimately all about issue advocacy. You can look at their missions, and what their mission is is to educate people against climate change. To the extent that they're involved with helping people on the ground, I think the problem that they have here is that they have to rely on an attenuated, indirect impact, which distinguishes this case from Havens and other cases. And Havens — I think we've heard about that already. If you want to wrap up real quick, then — No, I would urge this court to affirm the district court's decision. They have to show — we've been debating these issues. They have to show a substantial likelihood of standing and a likelihood of success on the merits. You know, even if these are borderline calls, I don't think they've met the requirements for the extraordinary remedy of a preliminary injunction. All right. Thank you very much. Thank you, Your Honor. Mr. Hurst, we'll give you two minutes. Thank you, Your Honor. So just a quick note about each of our two standing theories that we've been discussing. Well, I guess there's a third now, but I'll stick to services and PETA, and then a quick note on the merits. We are in exactly the same position as the plaintiffs in PETA. We are using an agency mechanism to protect people the same way. In PETA, they were using an organizational agency means of address to protect birds. We have a concrete interest in that, in the outcome of the process. We've been trying to protect these particular communities for years. Had they — had plaintiffs not been locked out of this process, they could have made changes to the project that would have avoided the harms that are within plaintiffs' mission to protect. That's all PETA requires. Were you locked out like PETA, or you could have sent in a letter? Well, Sugar Growers is clear that informal procedures don't take the place of formal procedures. And the reason for that is obvious here, because comments have to go to the board, but, you know, letters can go in the trash. So there's a reason why there's a formal procedure, and those procedures go to the board. Have you been sending in letters in the past? We have contacted informal — we have contacted them in the past. But, again, the benefit of comment under 10a is that those comments go to the board, and the board is who is ultimately making this decision. And I'll — well, why don't I get to that just really briefly. The important — on the merits, the reason that this was a final consideration is because it went to the board. My friend said, oh, there was this loan that was, you know, it was operative. Their vibe was all they were doing was changing amendments. That's not true at all. There was no loan if the board didn't approve it in 2025. The board could have said no. That's undisputed. And I heard a lot about conditions precedent. Ex-Im changed the conditions precedent in this — for 2025 to include a bunch of security conditions precedent because of the insurgency. And that's at JA-750 to 759. So the provision about when notice is required is crystal clear. It's required when the board considers a transaction. The board considered a transaction here. They tried to replace the word transaction with application. They tried to replace it with amendment. What the statute said is transaction. And this went to the board by their own rule because even just the dates, an extension of two years could have been done by staff. That wouldn't have gone to the board. An extension of four years has to go to the board. Okay. If there's no further questions, we'll take that back for Judge Childs. Thank you to all counsel for your advocacy. The case is submitted.
judges: Millett; Childs; Randolph